UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| DANIEL HOUDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 05-40075-FDS |
| | ) | |
| ROBERT TURGEON, STEPHEN GUNNERSON, KEVIN JOHANSON, MATTHEW D'ANDREA, BRIAN HALLORAN, THOMAS DUFFY, and the CITY OF WORCESTER, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil rights action against six police officers and the City of Worcester arising out of a violent altercation during an arrest. Plaintiff Daniel Houde alleges that on the evening of May 20, 2002, police officer Robert Turgeon stopped Houde's camper for a minor violation involving a license plate. Turgeon approached the camper and requested Houde's driver's license and registration. Houde refused to comply and was forcefully dragged out of the camper by Turgeon and officers Kevin Johanson and Stephen Gunnerson. A violent struggle then ensued between Houde, Turgeon, Johanson, Gunnerson, and three additional officers who had arrived on the scene—Brian Halloran, Matthew D'Andrea, and Thomas Duffy. Houde was subdued and taken to the police station for booking. Because he suffered severe injuries in the altercation, he was transported to the hospital immediately.

A criminal complaint was filed against Houde charging him with various offenses arising out of the incident. He eventually pleaded guilty to all charges.

Houde filed this lawsuit on May 17, 2005, alleging various civil rights violations and common law torts. Defendants have moved for summary judgment as to all counts. For the reason set forth below, the City of Worcester's motion for summary judgment will be granted, but the individual defendants' motion for summary judgment will be denied.

## I. Factual Background

The facts are set forth in the light most favorable to the plaintiff.

### A. Houde's Business and Interaction with the Worcester Police

Daniel Houde owns a mobile kitchen business called "Fun Times Food Festivals" that operates four food service trucks. The trucks are principally used to sell food near Worcester-area concert venues and nightclubs. In 1998, the owners of one such club, the Palladium, asked Houde to manage a pizza parlor on their property, but the arrangement fell through when the club's management changed hands. According to Houde, after that the Palladium owners did not want him parking his food service trucks near their establishment or competing with their pizza business.

Around the same time, Houde and his drivers began experiencing problems with the Worcester police. Houde suspected that he was being targeted by the police because the father of a Worcester police officer owned a competing food service truck, "Munch Times."[1] Among other things, Houde contends that the police would shut down his food trucks on certain nights and

---

[1] Houde was a competitor of both the pizza vendor in the Palladium and Munch Times. Gunnerson and Johanson both acknowledged in their depositions that they knew that a fellow officer's father owned Munch Times. Both officers also acknowledged that they had worked paid details for the Palladium in the past.

falsely accuse him of violating parking ordinances, and that the police would repeatedly pull over his trucks so that his license and registration could be checked.

In 2001, Houde was arrested for possession of marijuana. According to Houde, the arresting officer told him to pack up his business and "get out of the city." Defendant Turgeon has acknowledged that he has personally investigated Houde because Turgeon's mother, who lived nearby, believed Houde was selling drugs out of his house.[2]

### B.     Incident on May 20, 2002

On May 20, 2002, Houde and a friend, Renee Rudy, left a Worcester bar and drove his camper toward Walsh's fabrication shop, about 200 yards away. According to the police report, officer Robert Turgeon spotted Houde's camper and noticed that one license plate was not properly affixed and did not match the other. He activated the lights on his cruiser and signaled Houde to pull over. Houde, however, continued driving and pulled into the loading dock at Walsh's. Turgeon, accompanied by several other police cruisers, drove in behind him.

Turgeon approached the driver's side of Houde's camper and requested that he open his door and hand over his license and registration. Houde refused, keeping his hands in the area of his waist.[3] Officer Kevin Johanson entered the rear door of the camper and officer Stephen Gunnerson entered through the passenger side door.[4] The officers then attempted to shove

---

[2] Turgeon testified at his deposition that, three to six months prior to the altercation, he began investigating Houde based on his mother's concerns. Turgeon brought these concerns to his superiors, who told him they "would look into it." Turgeon further testified that, on his own initiative, he began to stake out Houde's home and occasionally stopped vehicles coming out of it.

[3] According to the police report, this led Turgeon to believe that Houde had something to hide and made him fear for his safety.

[4] Rudy apparently fled the scene before Johanson and Gunnerson entered the vehicle. She was later found at a nearby bar, arrested, and charged with disorderly behavior, disturbing the peace, assault and battery with a

Houde out the driver side door. Houde resisted, initially keeping his grip on the steering wheel and refusing to let go. The officers attempted to loosen his grasp by hitting his forearm. Eventually, Houde released his grip and flailed his arms and legs, striking Turgeon and Johanson with his fist and kicking Gunnerson in the chest. At some point, Turgeon saw Houde drop a small plastic bag containing a hardened white substance that he suspected was crack cocaine.

When the officers realized it was going to be difficult to remove Houde, Johanson and Gunnerson dragged him to the back of the camper. Houde contends that one officer held him while the other repeatedly hit him in the chest and stomach.[5] The blows caused Houde to slide in and out of consciousness. He then stumbled out of the camper and fell to the ground, where he laid face down in a pool of blood.

By the time Houde fell to the ground, officers Brian Halloran and Matthew D'Andrea had arrived; officer Thomas Duffy arrived at some point after that. According to Houde, the officers continued to beat him even though he was no longer resisting. Halloran held Houde's legs down and Gunnerson pinned down his head while Johanson and Turgeon struggled to handcuff him. D'Andrea stood a couple of feet away.[6] There is no dispute that Houde was struck multiple times. Gunnerson acknowledged that he struck Houde twice in the face and Turgeon

---

dangerous weapon (car door), resisting arrest, and a traffic offense.

[5] Houde identified the two officers only as the first and second ones to enter his camper. Based on the defendants' affidavits, it appears that Johanson first entered the camper through the rear door and that Gunnerson later came in through the passenger side door.

[6] D'Andrea was apparently restraining a dog that defendants contend belonged to Houde. Several of the officers reported that Houde was encouraging the dog to attack.

acknowledged that he punched him in the shoulder.[7]  At some point in the altercation, Duffy used pepper spray on Houde.[8]

Houde was eventually handcuffed and taken to the police station for booking.  Upon seeing the seriousness of his injuries, the booking officer instructed the officers to take Houde to the hospital.[9]  At the hospital, Houde was treated with pain medication and sutures and released back into police custody.  The next day, the presiding judge refused to arraign Houde due to the seriousness of his injuries and sent him back to the hospital for further evaluation and treatment.

Houde has submitted hospital records and disturbingly graphic photographs showing severe facial swelling and bruising, blurry vision, abrasions on his arms and legs, and a laceration above his eye.

### C. Worcester Police Department's Policies on Use of Force and Conducting Internal Investigations

The Worcester Police Department's policy on the use of force states that "lawful and proper force is restricted to only that force necessary to control and terminate unlawful resistance and to prevent any further physical attack against the police officers or any other person."  Types of force are categorized as "deadly" or "non-deadly"; the policy also sets forth preferred means of using force in ascending order ranging from verbal warnings to use of deadly force.  The policy does not contain a specific provision concerning striking a suspect in the face.

---

[7] Gunnerson contends that Houde was on the ground with his arm underneath his body, which made it hard to handcuff him.  According to Gunnerson, Houde ignored the officer's command to put his hands behind his back, but it is unclear whether Houde was conscious at that point.

[8] According to Turgeon, Duffy sprayed Houde after warning him to stop resisting.

[9] According to Houde, the report filed by Turgeon and Gunnerson was inaccurate, and both officers have subsequently testified to different versions of the incident.

The policy also requires that police officers note any medical treatment that a person receives in their police reports and to notify their immediate supervisor promptly of any incident involving the use of force. If an officer uses force that results in serious physical injury, his or her unit commander or designee is required to notify the director of the stress unit so that an administrative review can be completed.

On the evening of Houde's arrest, John Lewis was the shift supervisor in the police department. As a supervisor, Lewis was responsible (among other officers) for implementing the department's policies and procedures.

### D. Criminal Proceedings Against Houde

After the incident, Houde was charged in a criminal complaint with (1) illegal possession of a controlled substance; (2) assault and battery with a dangerous weapon (shod foot); (3) three counts of assault and battery on a police officer; (4) resisting arrest; (5) failure to stop for a police officer; (6) improperly attaching license plates; (7) operating an uninsured motor vehicle; and (8) operating an unregistered motor vehicle. He later pleaded guilty to all of the charges.

## II. Procedural History

On May 17, 2005, Houde filed a complaint against officers Turgeon, Gunnerson, Johanson, D'Andrea, Halloran, Duffy, and another officer, as well as the City of Worcester, alleging various civil rights violations and common law torts.[10] On February 12, 2007, defendants filed a motion for summary judgment on all counts. In Houde's opposition to the summary judgment motion, he stated that he does not intend to pursue many of his claims; the claims that

---

[10] In his opposition to the motion for summary judgment, Houde has indicated that he does not intend to pursue the claims against the seventh officer, Sean McCann.

remain against the individual officers consist of the following: (1) conspiracy to deprive Houde of his civil rights; (2) intentional infliction of emotional distress; and (3) assault and battery. Houde also contends that the City of Worcester violated of 42 U.S.C. § 1983 by improperly training police officers and maintaining unconstitutional customs and practices.

## III. Analysis

### A. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

### B. Constitutional Claims against Individual Defendants

#### 1. Conspiracy to Deprive Houde of his Civil Rights

Houde contends that the individual defendants engaged in a civil rights conspiracy in violation of 42 U.S.C. § 1983, the goal of which was to use excessive force against Houde.[11] A

---

[11] In his complaint, Houde alleged the defendants engaged in a conspiracy to deprive him of his civil rights through, among other things, unlawful stops, harassment, searches and seizures, deprivation of property without due process, false imprisonment, abuse of process, assault and battery, cruel and unusual punishment, and deprivation of his constitutional right to due process. However, in his opposition to defendants' motion for summary judgment, Houde stated that he was limiting his claim to conspiracy to violate § 1983 by using excessive force. The Court accordingly will address only the narrower claim.

conspiracy is

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another' and 'an overt act that results in damages.'

*Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989), (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979), *overruled on other grounds*, 446 U.S. 774 (1979)). In the § 1983 context, "the gist" of the cause of action is "the deprivation and not the conspiracy." *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) (internal citations omitted). Indeed, conspiracy "is merely the mechanism by which to obtain the necessary state action . . . or to impose liability on one defendant for the acts of the others." *Id.* In order to establish the "deprivation" element, the plaintiff must prove that he was actually deprived of a constitutional right. *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988). It is not necessary to show an express agreement to prove a conspiracy. *Id* at 845. Instead, "sufficient circumstantial evidence of a conspiracy among the officers to violate [plaintiff's] constitutional rights will carry the day." *Jesionowski v. Beck*, 937 F. Supp. 95, 105 (D. Mass. 1996).[12]

---

[12] Defendants contend that plaintiff's civil rights conspiracy claim is barred by the rule that defendants cannot collaterally attack criminal convictions through civil tort actions where the suit would "necessarily imply" the invalidity of the convictions. *See Heck v. Humphrey*, 512 U.S. 477, 487 (1994). However, the First Circuit has recognized that a "§ 1983 excessive force claim brought against a police officer that arises out of the officer's use of force during an arrest does not necessarily call into question the validity of an underlying state conviction and so is not barred by *Heck*." *Thore v. Howe*, 466 F.3d 173, 180 (1st Cir. 2006). "Even the fact that defendant was convicted of *assault* on a police officer does not, under *Heck* as a matter of law *necessarily* bar a § 1983 claim of excessive force." *Id.* (emphasis in original). Here, a finding that defendants' use of force was unreasonable would not necessarily mean that Houde did not resist arrest or did not commit assault and battery. Thus, a judgment in Houde's favor on his § 1983 claim "could easily coexist" with his conviction. *See Ballard v. Burton*, 444 F.3d 391, 401 (5th Cir. 2006).

### a.     <u>Deprivation of a Constitutional Right</u>

In certain circumstances, "the use of excessive force or violence by law enforcement personnel violates the victim's constitutional rights." *Landrigan,* 628 F.2d at 741. In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court established a balancing test for determining the constitutionality of a particular use of force. Specifically, the Court stated that:

> [d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake.

*Id.* at 396. Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "Without excluding the importance of other factors, the *Graham* Court focused its reasonableness inquiry on three factors in particular: 1) whether the suspect is actively resisting arrest or attempting to evade arrest by flight, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) the severity of the crime at issue." *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 150 (1st Cir. 2003).

Here, there is a genuine issue of material fact as to whether the defendant police officers used reasonable force. It is undisputed that Houde resisted arrest and assaulted the officers—indeed, he pleaded guilty to doing so. Nonetheless, even where a suspect resists arrest and assaults the arresting officers, the police still must respond with a reasonable amount of force. *See Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("even where some force is justified, the amount actually used may be excessive"). In making the reasonableness determination, courts may consider "the extent of injury inflicted" upon a suspect. *Putman v. Gerloff*, 639 F.2d 415,

420 (8th Cir. 1981). Viewing the evidence in the light most favorable to Houde, there is a genuine issue as to whether it was reasonable for six police officers to beat an unarmed suspect who was passing in and out of consciousness. Furthermore, the graphic color photographs taken of Houde after his arrest, the reaction of the booking officer and judge to his appearance, and his hospital medical records indicate that he was seriously injured.

### b. **Agreement**

In addition, sufficient circumstantial evidence of an agreement among the defendant officers exists here to overcome summary judgment. Plaintiff contends that during the altercation, some officers held Houde down while other officers beat him. Although plaintiff could not identify by name the officers involved in the melee, Turgeon has testified that he, Gunnerson, Johanson, and Halloran were all either physically holding or striking Houde, and that Duffy used pepper spray on him.[13] D'Andrea testified that he was as close as two feet from the plaintiff while this was all taking place.[14]

Plaintiff need not show express agreement to prove a conspiracy—circumstantial evidence is sufficient. *Beck*, 937 F. Supp. at 105. However, circumstantial evidence must amount to more than mere "speculation and conjecture" by plaintiff. *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir. 1986). A claim of conspiracy must be pleaded with particularity, make reference to material facts,

---

[13] The rapid arrival of Gunnerson and Johanson on the scene is also noteworthy. In his deposition, Turgeon testified that after stopping plaintiff's vehicle, he waited only a "few seconds" for other officers to arrive; he could not recall if other officers arrived before he approached the vehicle. However, Turgeon does recall that *while* he was asking plaintiff for his license and registration, Johanson was behind him and Gunnerson was on the passenger side of the vehicle. At that point, Houde had been stopped for a relatively trivial license plate violation, and Houde had not displayed any obstinacy or aggression.

[14] In addition, Turgeon acknowledged frequent stakeouts of the plaintiff in the months before the altercation. Johanson and Gunnerson knew that plaintiff was competing with the father of a fellow officer, and both officers had also worked paid details for another of plaintiff's business rivals.

and amount to more than conclusory allegations. *See Ahanotu v. Massachusetts Turnpike Auth.*, 466 F. Supp. 2d 378, 389 (D. Mass. 2006); *Watterson v. Page*, 987 F.2d 1, 9 n.7 (1st Cir. 1993); *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977).

Plaintiff has met that burden here. When police officers act in concert to apply excessive force, there is a genuine issue of material fact as to whether the officers engaged in a conspiracy. *Beck*, 937 F. Supp. at 105.[15]

### 2. <u>Immunity Defense</u>

Defendants contend that even if there is evidence sufficient to support plaintiff's civil rights conspiracy claim, they are nonetheless entitled to qualified immunity. Qualified immunity shields government officials who are performing discretionary functions from liability for civil damages in cases where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). That inquiry "turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow*, 457 U.S. at 818-19) (1987); *see Nolan v. Krajcik*, 384 F. Supp. 2d 447, 465 (D. Mass. 2005).

The Court is required to follow a three-step procedure for determining whether a state actor is entitled to qualified immunity. Under this standard, courts are required to consider:

---

[15] Defendants contend in their memorandum in support of summary judgment that the case of *McGillicuddy v. Clements*, 746 F.2d 76 (1st Cir. 1984) stands for the proposition that showing "defendants acted jointly in concert" is per se inadequate to show of the existence of a conspiracy. The case actually states in relevant part: "[Plaintiff] alleges that [defendant] acted 'under color of state law' and 'jointly in concert' with the other defendants, who are state employees, but does not allege specific facts to support these allegations". *Id.* at 77. This language merely requires a factual basis for an allegation of "concerted action", which is completely different than stating generally that organized, concerted action can never show conspiracy.

> (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discern constitutional right.

*Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).

If Houde's allegations are true, defendants violated his constitutional rights by using excessive force during his arrest.  Also, defendants do not appear to dispute that the constitutional right at issue here—the right to be free from the use of excessive force—was well-established by the time of the incident.  Therefore, the only disputed factor is whether a similarly situated, objectively reasonable officer would have known that his conduct violated Houde's constitutional rights.[16]  In making this determination, the Court must keep in mind that qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force" and "can apply in the event the mistaken belief was reasonable." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

As noted, there is a dispute of fact as to how much force the defendants used against Houde on the evening of May 20, 2002.  What began as a traffic stop for a minor violation rapidly escalated into a physical altercation, in which Houde was severely beaten and sustained substantial physical injuries.  Viewed from the standpoint of an objectively reasonable officer, Houde's resistance to defendants' efforts to handcuff him may not have warranted such an extreme

---

[16] Defendants contend that because there was probable cause to arrest defendant and because Houde pleaded guilty to all charges, it necessarily follows that reasonable officers in their position would have believed their behavior was lawful.  That argument might be persuasive if plaintiff were alleging that he was deprived of the right to be free from arrest without probable cause.  However, probable cause for arrest does not give an arresting officer carte blanche to use excessive force. *See Nolan*, 384 F. Supp. 2d at 466-68 (finding that officer was protected by qualified immunity as to claim of arrest without probable cause but not as to excessive force claim).

response. A reasonable officer may not have believed that defendants' conduct was appropriate. Under the circumstances, defendants are not entitled to summary judgment on the issue of qualified immunity.

### C. State Law Claims against Individual Defendants

#### 1. Intentional Infliction of Emotional Distress

In order to maintain a cause of action for intentional infliction of emotional distress, Houde must establish (1) that the individual defendants intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of their conduct; (2) that their conduct was extreme and outrageous and beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that their actions caused plaintiff's distress; and (4) that the emotional distress plaintiff sustained was "severe" and of a nature "that no reasonable man could be expected to endure." *Agis v. Howard Johnson Co.*, 371 Mass. 140 (1975).

Summary judgment on this claim must be denied as to each of the individual defendants. The sole issue defendants raise in their argument for summary judgment on this claim is that "[p]olice officers do not act in a extreme, outrageous, and intolerable manner when they make an arrest based upon probable cause, and the distress that invariably accompanies an arrest, while it can be quite severe, is not beyond the limits of what a reasonable person can be expected to endure". *Sholley v. Town of Holliston*, 49 F. Supp. 2d 14, 22 (D. Mass 1999).[17]

While this is an accurate statement of the law, it does not dispose of the present case. Plaintiff does not dispute the probable cause underlying his arrest or his subsequent conviction.

---

[17] As noted, when a plaintiff's action "even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Heck v. Humphrey*, 512 U.S. at 487. (emphasis in original).

Houde's intentional infliction claim is based on the claimed use of excessive force. A jury could reasonably find both that defendants used excessive force and that the use of excessive force constituted an intentional infliction of emotional distress. *See Poy v. Boutselis,* 352 F.3d 479, 485 (1st Cir. 2003) (denying defendant officer's motion for new trial because a jury finding of excessive physical force could permissibly support finding for plaintiff on intentional infliction claim).

### 2. Assault and Battery

Under Massachusetts law, assault and battery is "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *Beck*, 937 F. Supp. at 105 (quoting *Commonwealth v. McCan*, 277 Mass. 199, 203 (1932)). Massachusetts courts have held that "an officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest." *Julian v. Randazzo*, 380 Mass. 391, 396 (1980) (internal quotation omitted). The standard for determining whether a use of force was reasonable for purposes of an assault and battery claim are essentially the same as the reasonableness analysis required for an excessive force claim. *Beck,* 937 F. Supp. at 105 (assault and battery claims "rise or fall in the same manner" as Fourth Amendment claims). Accordingly, Houde's "assault and battery claims will rise or fall in the same manner as his Fourth Amendment claims," and summary judgment is not appropriate. *Id. See Parker v. Town of Swansea*, 310 F. Supp. 2d 356, 369 (D. Mass 2004) (recognizing that judgment on assault and battery claim would "parallel" judgment on excessive force claim).

### 3. Officer D'Andrea's Immunity Defense

Officer D'Andrea contends that he is immune from suit for the state torts of intentional infliction of emotional distress and assault and battery under Mass. Gen. Laws. ch. 263, § 3. That statute provides:

> No action, except for use of excessive force, shall lie against any officer other than the arresting officer, by reason of the fact that, in good faith and in the performance of his duties, he participates in the arrest or imprisonment of any person believed to be guilty of a crime unless it can be shown that such officer in the performance of his duties took an active part in the arrest or imprisonment as aforesaid, either by ordering or directing that said arrest or imprisonment take place or be made, or by actually initiating the making and carrying out of said arrest and imprisonment . . . .

*Id*. The inquiry under the statute is two-fold: (1) the officer must have been acting in good faith and in the performance of his duties, and (2) the officer must have taken an "active part" in the arrest or imprisonment. *Santiago,* 891 F.2d at 384-385.

Both elements must be satisfied for the statutory immunity to apply. *Id.* at 385. As to the "good faith" requirement, even secondary participation while having "no belief [the defendant] is guilty of a crime" may be sufficient. *Id.* at 384-385. As to the "active part" requirement, any officer except one with an extremely attenuated connection to an incident of arrest and imprisonment is considered to have taken an "active part in an arrest." *See Hall v. Ochs*, 817 F.2d 920, 926 (1st Cir. 1987) (expressing doubt in dicta that a booking officer who read the defendant his rights at the police station took an active part in the arrest). Thus, summary judgment is not appropriate when an officer is actually present at an arrest and is more than completely passive. *See Rose v. Concord*, 971 F. Supp. 47, 49, 52 n.6 (D. Mass. 1997) (two officers drawing guns on a suspect and the suspect later being placed in their cruiser did not implicate the immunity statute because the officers "took part in carrying out" the arrest and imprisonment); *Mullen v. Falmouth*, p. *2 (1995 WL 464913) (secondary officers on scene could

15

not shelter in immunity statute for purposes of summary judgment when they discussed with the arresting officer, pre-arrest, ways for the arresting officer to avoid a personal liability lawsuit).

D'Andrea contends that his entire role in the incident consisted of protecting the other officers by restraining a dog. However, plaintiff disputes that D'Andrea's back was turned during the incident and characterizes the very presence of the dog as "suspicious." Drawing all reasonable inferences in favor of the plaintiff, and considering that D'Andrea himself admits he was as close as two feet to the plaintiff, a jury could reasonably find that D'Andrea took an active part in the arrest. Summary judgment as to the statutory immunity issue will therefore be denied.

### D.     Claim Against the City of Worcester

Houde's final claim under § 1983 is against the City of Worcester for municipal liability. To prevail on such a theory, the plaintiff must show that "the municipality *itself* causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). Thus, the plaintiff is required to demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation. *Harris*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy must be the "moving force [behind] the constitutional violation"); *Santiago v. Fenton*, 891 F.2d at 373, 381-82.

Houde's claim as to an alleged municipal policy rests on two assertions: that defendants' supervisor, John Lewis, could not recall the police department's policy on the use of force by memory, and did not know whether defendants received training on strikes to the face. As a result, according to Houde, Lewis could not have adequately trained the police officers he

supervised, and thus the City may be held responsible for his injuries.

Houde's factual allegations, even if true, "fail to reach the high standard the Supreme Court has set out for a finding of liability for inadequate training of police officers." *Santiago,* 891 F.2d at 381. In *Harris*, the Supreme Court held that a municipality's failure to train its employees is "properly thought of as a city 'policy or custom'" actionable under § 1983 "[o]nly where [the] failure . . . evidences a 'deliberate indifference' to the rights of its inhabitants." 489 U.S. at 389; *see also Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various policy alternatives.").

The Worcester Police Department has adopted a detailed policy regarding the use of force; Houde does not appear to allege that the policy itself was inadequate. Where, as here, a policy is not by its terms unconstitutional, "'considerably more proof than the single incident will be necessary' to ultimately establish at trial both fault on the part of the municipality and the causal nexus between the policy and the constitutional deprivation." *McGrath v. MacDonald*, 853 F. Supp. 1, 4 (D. Mass 1994) (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). In such cases, it must be proven that the municipality's policy is "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694.

Houde has not provided any such proof. There is no evidence that Lewis was the only person in the police department responsible for training officers in the use of force. While Lewis testified that he was responsible for ensuring that the officers under his watch were following the department's policies, that is far from sufficient to establish a claim of inadequate training. Indeed, even if defendants did not receive any such training from Lewis, Houde has provided no

17

evidence that they received no training of any kind. Nor was Lewis required to memorize the policies to avoid municipal liability. In short, plaintiff has not addressed evidence of "gross negligence" by the city's policymakers or "deliberate indifference to the constitutional rights of those with whom the police would come into contact." *Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir. 1989). Accordingly, summary judgment will be entered in the City of Worcester's favor.

## IV.   Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part as to the claim against the City of Worcester, and DENIED in part as to the claims against the individual defendants. All claims against defendant Sean McCann, and Counts III (intentional indifference with prospective business relations), IV (abuse of process), V (false imprisonment, and VII (libel) are hereby DISMISSED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: September 30, 2007